GRUENSPAN, Appellant,

v.

SEITZ et al., Appellees.

[Cite as *Gruenspan v. Seitz* (1997), 124 Ohio App.3d 197.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 71712.

Decided Nov. 24, 1997.

198

*Charles Gruenspan, pro se.*

*Reminger & Reminger* and *Brian D. Sullivan; Jacobson, Maynard, Tuschman & Kalur* and *Douglas G. Leak,* for appellees and cross-appellant.

Patton, Judge.

Plaintiff-attorney Charles Gruenspan brought this libel and tortious-interference-with-judicial-process action against defendant-doctor William H. Seitz, Jr., Seitz's attorney, Clay Robinson, and Robinson's law firm, Jacobson, Maynard, Tuschman & Kalur. The allegations of the complaint arose from statements Seitz made in a letter he sent to a common pleas judge hearing a medical malpractice action that plaintiff prosecuted on behalf of a client. Statements in the letter condemned plaintiff's behavior in scheduling Seitz's deposition, and also raised criticisms, allegedly attributable to Robinson, of plaintiff's conduct in unrelated cases. Seitz filed a counterclaim against plaintiff seeking compensation for time spent giving a deposition in the medical malpractice action. The trial court granted summary judgment to all defendants on plaintiff's claim and granted summary judgment to plaintiff on Seitz's counterclaim. Both plaintiff and Seitz appeal. The primary issue in this appeal centers on the trial court's finding that Seitz's letter enjoyed the protection of a qualified privilege, thus foreclosing plaintiff's claims.

The client plaintiff represented in the medical malpractice action cut her finger and required medical attention. The attending physician anesthetized the finger with Benadryl (after learning of the client's allergies to other local anesthetics) and sutured the wound. Unfortunately, complications ensued, and Seitz was later called upon to amputate the tip of the client's finger. The client's suit alleged that the attending physician breached the applicable standard of care by using Benadryl as an anesthetic.

During discovery in the medical malpractice action, plaintiff sought to meet with Seitz, who had not been named a party to the action, and discuss his client's treatment. Seitz refused, pointing out that plaintiff's client had not paid Seitz's medical fee. Plaintiff acknowledged his client's outstanding bill and offered to pay Seitz's usual $250 per hour consulting fee for the meeting. When Seitz continued to refuse to meet plaintiff, plaintiff had the court issue a subpoena for his deposition.

Seitz contacted the judge hearing the matter and asked for instructions. The judge told Seitz he should consult with counsel. Seitz's attorney contacted plaintiff and assured him that Seitz would agree to meet, provided that plaintiff "reasonably compensate" Seitz. Plaintiff stated that his previous offers of compensation were still available.

When the parties tried to schedule a mutually agreeable date, Seitz told plaintiff that he charged a deposition rate of $750 for the first hour and $250 for each additional half hour. Plaintiff told Seitz that he did not want to take his deposition and did not wish to discuss any opinions relating to the care rendered

by the attending physician, but simply wanted to discuss the procedures Seitz rendered, as well as Seitz's impressions concerning the cost of future surgery. Plaintiff assured Seitz that the meeting would last one-half hour and that plaintiff "would compensate you for your time."

Seitz again refused to schedule a meeting without first receiving full payment of his medical bill, so plaintiff had the court issue a second subpoena for Seitz's deposition. The deposition went forward with plaintiff, Seitz, and defendant Robinson (representing the defendant doctor in the medical malpractice action) present. At the conclusion of Seitz's deposition, Robinson apparently asked plaintiff about Seitz's fee. Plaintiff denied owing Seitz any money other than the six dollar witness fee and stated that he "never agreed" to pay the fee. Seitz's office manager gave testimony that plaintiff "never disagreed" to pay Seitz's quoted fee, and that Seitz's terms were "crystal clear."

The day after his deposition, Seitz wrote a letter to the judge hearing the medical malpractice case in order to register his complaint against plaintiff's refusal to pay his deposition fee. After describing plaintiff's offending conduct, Seitz stated:

"This is dishonest and unethical. Furthermore, this case has no merit whatsoever. I think you will recognize that when you see all the facts. Nonetheless, the way this attorney has dealt with me and my office staff, the manner in which he pursues his line of questioning is a travesty and a disgrace to the profession of law.

"I do not as a rule testify in cases as an expert witness unless it involves a patient of my own and I feel that my testimony is made in the interest of justice. I have testified both on behalf of the plaintiff as well as on behalf of the defendant in malpractice cases. The defense attorney in this case has asked me yesterday if I would testify as a witness for the defense because Mr. Gruenspan has pulled this sort of maneuver on some of the other physicians involved and the patient has also not paid other medical bills and he cannot get a physician involved in the case willing to testify simply because they do not want to pay the expense of more time and aggravation. I told him that I would testify because I feel so strongly that there is no merit to this case and am concerned that in the absence of sufficient testimony, Mr. Gruenspan might succeed in a case that has no business even being in the courts." [1]

Seitz forwarded copies of the letter to Cleveland Bar Association Ethics Committee and the Academy of Medicine of Cleveland Medical–Legal Committee. The medical malpractice case went to trial before a visiting judge, with the jury

---

1. The entire letter is reproduced in the appendix to this opinion.

rendering a defense verdict by making the specific finding that there had been no breach of the applicable standard of care.[2]

As a result of this letter, plaintiff filed the action presently before this court, making the following allegations: (1) that Seitz's letter to the judge hearing the medical malpractice case libeled him in ten respects, (2) that Seitz's letter to the judge unlawfully interfered with justice, thus constituting tortious interference with his business relationship, (3) that Robinson slandered plaintiff in two respects, and (4) that Jacobson, Maynard, Tuschman & Kalur, as Robinson's employer, bore liability under a theory of *respondeat superior.* Seitz filed a counterclaim in which he sought payment of $1,350 for his time spent in deposition.

All defendants filed motions for summary judgment; plaintiff filed a motion for summary judgment on Seitz's counterclaim. The trial court initially denied summary judgment to Seitz on the defamation claim, finding that although Seitz was entitled to a qualified privilege in sending the letter, plaintiff had demonstrated the existence of issues of material fact remaining on the question of actual malice. The trial court later reconsidered that ruling, concluding that plaintiff failed to meet his burden of proof by clear and convincing evidence that Seitz's communication had been made with actual malice, that is, that Seitz made the statements with knowledge that the statements were false or with a reckless disregard of the falsity of the statements.

The trial court also found that plaintiff failed to prove the existence of issues of fact relating to his tortious-interference-with-business claim. The court found no evidence suggesting that Seitz's letter had any effect on the medical malpractice trial, particularly since a visiting judge presided over the trial.

As to the motions for summary judgment filed by Robinson and Jacobson, Maynard, Tuschman & Kalur, the trial court found the allegedly slanderous material susceptible of too many interpretations to be considered slander *per se.* Having reached that conclusion, the court found that the claim of *respondeat superior* could not survive.

The trial court granted plaintiff's motion for summary judgment on Seitz's counterclaim without opinion.

## I

The first assignment of error is that the trial court erred by granting Seitz a qualified privilege to publish his letter to the judge hearing the medical malprac-

---

**2.** We recently affirmed the verdict in *Siegel v. Birnbaum* (Feb. 20, 1997), Cuyahoga App. Nos. 69059 and 69105, unreported, 1997 WL 72143.

tice action. Plaintiff cites Seitz's statement that "this case has no merit whatsoever" as proof that Seitz exceeded the scope of the privilege because he no longer wished to issue a complaint about plaintiff's behavior, but instead attempted to influence the outcome of the malpractice case and subvert justice in the medical malpractice case.

To establish a claim for libel, the plaintiff must show (1) a false statement, (2) that is defamatory towards the plaintiff, (3) the statement must be in writing, (4) the statement must be published, and (5) the defendant must be proven guilty of some degree of fault. See *Black v. Cleveland Police Dept.* (1994), 96 Ohio App.3d 84, 88, 644 N.E.2d 682, 684.

Otherwise actionable statements may be protected by the existence of a qualified or conditional privilege. *Hahn v. Kotten* (1975), 43 Ohio St.2d 237, 244, 72 O.O.2d 134, 138, 331 N.E.2d 713, 718–719. A qualified or conditionally privileged statement exists when " 'made in good faith on any subject matter in which the person communicating has an interest, or in reference to which he has a right or duty, if made to a person having a corresponding interest or duty on a privileged occasion and in a manner and under circumstances fairly warranted by the occasion and duty, right or interest. *The essential elements thereof are good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion, and publication in a proper manner and to proper parties only.'* (Emphasis added.)" *Id.*, quoting 50 American Jurisprudence 2d (1970) 698, Libel and Slander, Section 195.

The privilege will be recognized when it is " 'fairly made by a person in the discharge of some public or private duty, whether legal or moral, or in the conduct of his own affairs, in matters where his interest is concerned.' " *Id.* at 244, 72 O.O.2d at 138, 331 N.E.2d at 718, quoting Prosser, The Law of Torts (4 Ed. 1971) 789, Section 115(3). The privilege attaches to the situation giving rise to the communication, not the communication itself. *A & B–Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council* (1995), 73 Ohio St.3d 1, 8–9, 651 N.E.2d 1283, 1290–1291. Although the existence of a qualified privilege is a mixed question of fact and law, summary judgment may be appropriate when "the circumstances of the occasion for the alleged defamatory communications are not in dispute." *Id.* at 7, 651 N.E.2d at 1290.

In its first opinion, the trial court found that plaintiff submitted enough evidence to establish a prima facie case of libel and that Seitz failed to establish the truth of the statements contained in the letter as an absolute defense. The trial court considered the existence of a qualified privilege and found that Seitz wrote the letter in an effort to resolve a fee dispute from the deposition and to register a complaint against plaintiff's practices. The court stated, "Plaintiff has

produced no evidence to demonstrate Seitz did not make his statements in good faith." The court went on, however, to find that plaintiff made a sufficient showing of malice because Seitz's statements allegedly injured plaintiff's professional reputation—and that the court would presume malice when the defamation injures one in one's trade or profession. On reconsideration, the trial court reversed itself, finding that plaintiff had not carried his burden of showing malice by clear and convincing evidence.

Viewing the underlying facts in a light most favorable to plaintiff, see Civ.R. 56(C), we find that the trial court did not err by granting summary judgment to Seitz based upon the qualified privilege. Seitz sent the letter in order to "register the most strong complaint" regarding the ethics of plaintiff's professional conduct; thus, it falls within that category of communication made when the speaker has a moral obligation to speak.[3]

Certainly, Seitz demonstrated an interest in the matter by asserting a complaint against plaintiff's conduct during the discovery phase of the medical malpractice case. The trial judge had a similar interest in the matter because the trial court has inherent authority to control all matters relating to discovery. See *State ex rel. Grandview Hosp. & Med. Ctr. v. Gorman* (1990), 51 Ohio St.3d 94, 95, 554 N.E.2d 1297, 1298–1299. In sending the letter, Seitz showed an intention to comment on plaintiff's behavior in prosecuting the malpractice case. The letter stated, "I don't know what actions can be taken against this man but if he were a physician, he would be brought before the ethics committee of the Medical Society and made to account for his actions." These statements fall within the scope of communications made where a person is so situated that "it becomes right in the interests of society that he should tell third persons certain facts, which he in good faith proceeds to do." *Hahn, supra,* 43 Ohio St.2d at 245, 72 O.O.2d at 139, 331 N.E.2d at 719. Seitz's complaint that plaintiff acted dishonestly and unethically is protected by a qualified privilege.

In his complaint, plaintiff alleged that Seitz made two libelous statements concerning the validity of the malpractice case: (1) that plaintiff pursued a case having "no merit whatsoever" and (2) that plaintiff pursued a case "that has no business being in the courts." We reject plaintiff's argument that statements

---

3. Seitz also sent copies of the letter to the ethics committees of the bar association and the academy of medicine. Statements made in writing to a local bar association requesting an investigation into alleged ethical violations are qualified by an absolute privilege. See *Scanlon v. Caskey* (1990), 53 Ohio App.3d 104, 559 N.E.2d 750. Both the Cleveland Bar Association and the Academy of Medicine of Cleveland responded to Seitz's letter by informing him that investigations into plaintiff's behavior would be conducted. See Exhibits D and L, to Seitz's motion for summary judgment. Accordingly, we find any communication to either the bar association or the academy of medicine protected by an absolute privilege.

concerning the merits of the malpractice action are clearly outside the scope of the qualified privilege.

The qualified privilege protects those statements made when a reasonable person would be expected to speak his mind. The converse is that courts will not extend protection to statements that constitute mere officious intermeddling. The line between these two standards is understandably not a bright one. We believe that granting a privilege to those persons who believe they have a moral obligation to speak necessarily implies that some leeway should be given to those claiming the privilege on that ground. If the court is to err on any side, it should err on the side that extends the privilege to persons making such statements unless the opponent can demonstrate actual malice.

Seitz's comments, taken in the context of the fee dispute, were more a reflection of his aggravation with plaintiff's refusal to compensate him for his time spent at deposition rather than an actual comment on the substance of the malpractice action. When read in this context, Seitz's statements are hyperbole, having had no clear persuasive effect on the judge hearing the case. We can say this with assurance because this court considered this same question in the direct appeal brought from the defense verdict reached in the medical malpractice action. In *Siegel v. Birnbaum, supra,* we addressed an argument that the trial judge in the malpractice action should have found Seitz in contempt for sending the letter. In rejecting this argument we stated:

"[The client] was not prejudiced by the unilateral communication by Dr. Seitz to Judge Friedland, complaining of the conduct of [the client's] attorney following a deposition. One line of the two page letter refers to Dr. Seitz's opinion that the lawsuit is meritless. This is not sufficient evidence of impartiality of a trial judge. Furthermore, the letter was not directed to the judge who conducted the actual trial. The trial itself was transferred from Judge Friedland's docket to a visiting judge. The case was transferred back to Judge Friedland for post-trial motions and a brief remand from this court for a clarification of a journal entry. The letter written by Dr. Seitz could not have had an impact on the jury trial verdict." *Id.* at 14.

As we noted in *Siegel,* the judge who received the letter did not preside over the trial, so there is no probability that any influence from Seitz's letter could have affected the judge's impartiality. Because the letter had been prompted by Seitz's desire to communicate his complaints about plaintiff's professional conduct as an attorney, we find that the trial court did not err by extending the qualified privilege to any statements purporting to comment on the validity of the malpractice action. The first assignment of error is overruled.

## II

In his second assignment of error, plaintiff complains that the trial court erred by concluding that he failed to establish actual malice sufficient to defeat the invocation of the qualified privilege because Seitz sent the letter out of spite and solely to frustrate the malpractice action.

A qualified privilege may be lost if the person claiming the privilege made statements with actual malice. In *Jacobs v. Frank* (1991), 60 Ohio St.3d 111, 573 N.E.2d 609, paragraph two of the syllabus states:

"When a defendant possesses a qualified privilege regarding statements contained in a published communication, that privilege can be defeated only by a clear and convincing showing that the communication was made with actual malice. In a qualified privilege case, 'actual malice' is defined as acting with knowledge that the statements are false or acting with reckless disregard as to their truth or falsity."

The party seeking to defeat the qualified privilege bears the burden of showing actual malice, and "the fact that the alleged statements were made, standing alone, is insufficient to show that they were made with actual knowledge." *Black, supra,* 96 Ohio App.3d at 90, 644 N.E.2d at 685.

Plaintiff argues that Seitz should lose the qualified privilege because the statements in the letter were not limited in scope to complaints about discovery practice and that Seitz exhibited "malice" by denigrating the validity of the malpractice action, in a clear attempt to influence the proceedings. We agree with the trial court that plaintiff failed to show either of these arguments by clear and convincing evidence.

"Actual malice" sufficient to defeat a qualified privilege is different from "malice" or ill will as a state of mind prompting the communication. In *Jacobs,* the court took pains to distinguish a line of cases that used the common-law definition of "malice" as means of defeating the qualified privilege. Noting the "confusion" engendered by courts applying different standards, the Supreme Court expressly rejected the common-law standard in favor of the actual-malice standard set forth by the United States Supreme Court in *New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686—acting with knowledge that the statements are false or acting with reckless disregard as to their truth or falsity.

Nothing in the record indicates that Seitz sent his letter knowing that the statements contained therein were false or that he sent the letter with reckless disregard for the truth of those statements. The evidence submitted in support of Seitz's motion for summary judgment shows that the deposition ended

on an acrimonious note, with Seitz telling plaintiff to "keep your thirteen little pieces of silver and get the hell out of my office." This acrimony carried over to the following day when Seitz wrote to the judge hearing the malpractice case. This might conceivably qualify as evidence of "ill will" under the common-law definition of "actual malice," but that standard no longer applies. Because plaintiff failed to present clear and convincing evidence that Seitz knew his letter contained false statements or that he sent the letter with reckless disregard as to the truth or falsity of those statements, the trial court did not err by granting summary judgment. The second assignment of error is overruled.

### III

The third assignment of error relates to the tortious-interference-with-a-business-relationship claim. Plaintiff complains that the trial court erred by granting summary judgment because an issue of fact exists as to whether Seitz demonstrated an intention to interfere when he wrote to the judge hearing the malpractice case that "I feel so strongly that there is no merit to this case and am concerned that in the absence of sufficient testimony, Mr. Gruenspan might succeed in a case that has no business even being in the courts." Plaintiff argues that this statement manifested Seitz's intention to lie on the witness stand solely to preclude plaintiff from collecting any fee on a contingency basis.

A tortious-interference-with-business-relationship claim exists when a person, without privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relationship with another. *A & B–Abell, supra,* 73 Ohio St.3d at 14, 651 N.E.2d at 1294. This court recently listed the elements of a tortious-interference-with-business-relationships claim as requiring a plaintiff to show that one intentionally and improperly interfered with another's prospective contractual relation and the plaintiff suffered pecuniary harm resulting from the loss of benefits to the relation, regardless whether the interference consists of inducing or causing another not to enter into a contract or preventing the other from acquiring or continuing a prospective relation. See *Hoyt, Inc. v. Gordon & Assoc., Inc.* (1995), 104 Ohio App.3d 598, 603, 662 N.E.2d 1088, 1091.

The trial court did not err by granting summary judgment to Seitz on the tortious-interference-with-business-relationship claim because plaintiff failed to prove that Seitz interfered with the malpractice case. Plaintiff's argument is necessarily based on the premise that Seitz "lied under oath at trial," thus intentionally trying to assist the defense for the sole purpose of seeing plaintiff lose any contingent fee he might earn if his client were to prevail. Plaintiff failed to substantiate this allegation at all. He did not cite any portions of the *trial*

transcript to show what these alleged lies were.[4] The citations he did give were to portions of Seitz's *deposition* testimony concerning the dispute about the deposition fee. While this evidence might have had some relevance in establishing Seitz's motive to lie, it did not constitute any proof that he did, in fact, lie at the malpractice trial. The third assignment of error is overruled.

## IV

The fourth assignment of error relates to Robinson and Jacobson, Maynard, Tuschman & Kalur, and argues that the trial court erred by granting summary judgment on plaintiff's claim of slander. Plaintiff maintains that the trial court erred by finding Robinson's statements too "vague" to constitute slander *per se.*

In order to prove defamation, plaintiff must establish that Robinson made a false statement of fact about plaintiff that tended to harm his reputation. *Stow v. Coville* (1994), 96 Ohio App.3d 70, 72, 644 N.E.2d 673, 674–675. If statements are susceptible of two different meanings (one defamatory, the other not defamatory), they fall within the "innocent construction rule" and are not, as a matter of law, defamatory. See *Yeager v. Local Union 20* (1983), 6 Ohio St.3d 369, 372, 6 OBR 421, 423–424, 453 N.E.2d 666, 669–670; *Van Deusen v. Baldwin* (1994), 99 Ohio App.3d 416, 419, 650 N.E.2d 963, 965.

The allegedly defamatory remark by Robinson consisted of Seitz's statement in his letter:

"The defense attorney in this case has asked me yesterday if I would testify as a witness for the defense because Mr. Gruenspan has pulled this sort of maneuver on some of the other physicians involved and the patient has also not paid other medical bills and he cannot get a physician involved in the case willing to testify simply because they do not want to pay the expense of more time and aggravation."

In his complaint, plaintiff alleged that statements attributable to Robinson stated that he "pulled dishonest and unethical maneuvers on physicians" and that plaintiff "caused other physicians to refuse to testify as a result of such alleged maneuvers." The trial court found that the statements attributed to Robinson were "too vague to be considered *slander per se.* There are many interpretations for the phrase 'this sort of maneuver.'" (Emphasis in original.)

---

4. In fact, plaintiff did not submit any evidence at all in opposition to Seitz's motion for summary judgment. He did submit a "verified" brief, with a verification that "the allegations in the complaint, and the statements contained in the Plaintiff [*sic*] brief in opposition [*sic*] Defendant Seitz' Motion for Summary Judgment, are true to the best of his knowledge, information and belief." Although notarized, this verification will not suffice as an affidavit like that required by Civ.R. 56(E).

Viewing the allegedly defamatory statement in a light most favorable to plaintiff, we find that the trial court did not err by granting summary judgment because the statements attributed to Robinson were not so definite as to be defamatory, although we disagree with the trial court's conclusion that Robinson's statements were vague. The word "maneuver," read in context, does relate to plaintiff's alleged practice of misleading physicians into thinking that he would pay their customary fee for time spent at the deposition, only to withhold payment once the deposition concluded.

However, we find that the statements attributed to Robinson were not, as a matter of law, actionable because they did not make any slanderous assertion of unethical conduct by plaintiff. Robinson merely stated that "[plaintiff] has pulled this sort of maneuver on some of the other physicians involved * * *." Nothing in this statement indicates Robinson's desire to characterize plaintiff's actions as dishonest or unethical—the statements attributed to Robinson are statements that plaintiff apparently had not paid other physicians who were involved in the case. Plaintiff is able to characterize Robinson's remark as slanderous only when read in conjunction with Seitz's letter. But nothing in the letter gives the indication that Robinson made his remarks with the intent to slander plaintiff.

Plaintiff himself had difficulty pinpointing the slanderous nature of Robinson's remarks. In response to a deposition question whether it would be unethical for somebody to accuse him of not paying Seitz for the deposition, plaintiff admitted that Robinson's' statement "would not be unethical." In fact, plaintiff conceded that it would not be defamatory for a person to say in a general way that he failed to pay a doctor for a deposition.

In an affidavit submitted in support of the motion for summary judgment, Robinson stated unequivocally that he did not make the statements that Seitz's letter attributed to him. The affidavit stated, "At no time did I ever say, in any fashion whatsoever, to Dr. Seitz that Charles Gruenspan has pulled dishonest and unethical maneuvers on physicians." Plaintiff did not counter this affidavit and, in fact, had difficulty himself with pinpointing the precise nature of the unethical and dishonest conduct that Robinson allegedly referred to. Given the absence of evidence to show that Robinson actually made the statement and persuasive argument to show that the statement, if made, contained slanderous content, the trial court did not err by granting summary judgment to Robinson and Jacobson, Maynard, Tuschman and Kalur. The fourth assignment of error is overruled.

## V

In a cross-assignment of error, Seitz complains that the trial court erred by granting plaintiff summary judgment. Seitz argues that the trial court incorrectly found that it lacked subject matter jurisdiction over his compulsory counter-

claim to collect the witness fee he claimed from the medical malpractice case. Seitz argues that he and plaintiff had a binding oral contract for a deposition fee that would defeat any jurisdictional limitations imposed by Civ.R. 26(B)(4)(c).

Civ.R. 26(B)(4)(c) states that the court may require that the party seeking discovery pay an expert a reasonable fee for time spent in responding to discovery. The Staff Note to Civ.R. 26(B)(4)(c) states that the rule "is a logical extension of the concept that courts have power to control discovery."

In *Siegel v. Birnbaum, supra,* this court addressed this same question of Seitz's deposition fees in the direct appeal of the medical malpractice case. The court found that the trial court did not err by denying Seitz's claim for payment because the client in the malpractice case had called Seitz as a treating physician, not as an expert witness. *Id.* at 22. In dicta, the court found that the trial court would not have abused its discretion in denying Seitz's application for fees.

Seitz now argues that the parties had a contract for the deposition fee. It appears that parties in the midst of discovery may agree for payment of fees to deponents. In an analogous situation, the United States Supreme Court stated in *Crawford Fitting Co. v. J.T. Gibbons, Inc.* (1987), 482 U.S. 437, 439, 107 S.Ct. 2494, 2496, 96 L.Ed.2d 385, 389–390, that "[w]e agree and hold that when a prevailing party seeks reimbursement for fee paid to its own expert witnesses, a federal court is bound by the limit of [28 U.S.Code] § 1821(b), *absent contract* or explicit statutory authority to the contrary." (Emphasis added.)

The elements of a contract are offer and acceptance, supported with valid consideration. *Noroski v. Fallet* (1982), 2 Ohio St.3d 77, 79, 2 OBR 632, 633–634, 442 N.E.2d 1302, 1304. While the interpretation of the terms of a contract is undertaken as a matter of law, the existence of a contract is a question for the trier of fact. The Restatement of the Law 2d, Contracts (1981) 75, Section 26 states:

"A manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of intent."

If the offer invites acceptance by performance, the acceptee fulfills the terms of contract by performing the acts stated in the contract. *Bretz v. Union Cent. Life Ins. Co.* (1938), 134 Ohio St. 171, 11 O.O. 587, 16 N.E.2d 272. Questions surrounding the form of an offer are resolved against the offeror because, it is said, the offeror is the master of his offer. See Restatement of the Law 2d, Contracts (1981) 83, Section 29, Comment *a*.

Seitz submitted documents showing that plaintiff agreed to compensate Seitz for any time spent in deposition. These include a letter from plaintiff in which he stated, "I am interested in meeting with you for only one-half hour and would compensate you for your time." After plaintiff withdrew the first subpoena, he and Seitz's attorney eventually agreed that the deposition would go forward without the need for a subpoena, and Seitz's attorney recalled that "[plaintiff] agreed to reasonably compensate Dr. Seitz, a board certified orthopedic surgeon, for his time in the deposition." Seitz's office manager testified at deposition that she expressly informed plaintiff of Seitz's terms prior to the deposition and that plaintiff "never disagreed" to those terms.

For his part, the deposition transcript tends to show that plaintiff did not necessarily agree to Seitz's terms. While plaintiff had made several promises to compensate Seitz if he agreed to be deposed, plaintiff ultimately secured Seitz's attendance at the deposition by asking the court to issue a subpoena.

 We find that plaintiff's use of the second subpoena to secure Seitz's attendance at the deposition constituted an intervening act that negated or revoked any offer of compensation by plaintiff. Prior to having the court issue the subpoena, plaintiff tried to entice Seitz's voluntary presence at the deposition by offering to compensate Seitz for his time. Once he had the court issue the subpoena, plaintiff manifested an intent to revoke his offer of compensation to secure Seitz's voluntary attendance at the deposition. In our view, this constituted a clear revocation of the offer of compensation.[5] The cross-assignment of error is overruled.

*Judgment affirmed.*

KARPINSKI, P.J., and ROCCO, J., concur.

---

5. We express no opinion on whether plaintiff should have voluntarily compensated Seitz for his time spent in deposition under standards of practice governing lawyers and doctors promulgated by the Cleveland Bar Association. Those standards are aspirational, not compulsory.

APPENDIX

August 19, 1992

The Honorable Carolyn Friedland
Judge, Cuyahoga County Court of Common Pleas
1200 Ontario Street
Justice Center
Cleveland, Ohio 44113

Dear Judge Friedland:

I am writing to you in an effort to register the most strong complaint against Attorney Charles Gruenspan of 3570 Warrensville Center Road, #103, Shaker Heights, Ohio 44122.

As you may remember about two weeks ago I contacted you after Mr. Gruenspan subpoenaed me to testify in a malpractice case Cheryl Siegel versus Gary Birnbaum, M.D. Mr. Gruenspan at that time was aggressively harassing my office staff. I explained to him that I had taken extreme effort to take very good care of Ms. Siegel when she was a patient in 1986. Additionally, I spent an incredible amount of time giving her parents a tremendous amount of support through what they considered to be a very trying time. After three operations, multiple hospital visits and office visits and a myriad of telephone calls, many of which were made to my home directly in the evening, Ms. Siegel and her family never paid my bill. I have not before and not since felt so insulted by a patient. When Mr. Gruenspan contacted me and asked to met with me to give some of my time to discuss this case with him I explained to him my feelings regarding this case and that I did not wish to spend anymore time on the case of this young woman who had so rudely treated me. I explained to him that if he wished to pay her bill, I would gladly discuss the case with him. He then subpoenaed me.

I did as you suggested when I spoke with you and spoke with my attorney to try to get this subpoena dropped. He suggested that I try to simply arrange with Mr. Gruenspan for a discovery deposition to be paid at my standard fee and he stated that Mr. Gruenspan suggested that he would be agreeable to doing this. My office staff then contacted him, set up this discovery deposition for yesterday afternoon and he was told by my office manager, Diana Creviston that he would have to pay the fee in advance. He agreed to do so and she set up the deposition.

Mr. Gruenspan entered my office yesterday, never gave my secretary a check, came in, we went through the deposition in over two and one half hours. At the end of this time Mr. Gruenspan refused to pay my deposition fee. His exact words were "try and get it from me." He said I can try to collect out of the patient's settlement.

VOL0428 PG0264

214

-2-

This is dishonest and unethical. Furthermore, this case has no merit whatsoever. I think you will recognize that when you see all the facts. Nonetheless, the way this attorney has dealt with me and my office staff, the manner in which he pursues his line of questioning is a travesty and a disgrace to the profession of law.

I do not as a rule testify in cases as an expert witness unless it involves a patient of my own and I feel that my testimony is made in the interest of justice. I have testified both on behalf of the plaintiff as well as on behalf of the defendant in malpractice cases. The defense attorney in this case has asked me yesterday if I would testify as a witness for the defense because Gruenspan has pulled this sort of maneuver on some of the other physicians involved and the patient has also not paid other medical bills and he cannot get a physician involved in the case willing to testify simply because they do not want to pay the expense of more time and aggravation. I told him that would testify because feel so strongly that there is no merit to this case and am concerned that in the absence of sufficient testimony, Mr. Gruenspan might succeed in a case that has no business even being in the courts.

I will testify but I will not accept any money for this testimony, rather I will direct that any appropriate fee for such testimony be directed toward Health Hill Hospital. I want you to know that Mr. Gruenspan told me that I could apply to the court for $6.00 for my time for having been subpoenaed.

I don't know what actions can be taken against this man but if he were a physician, he would be brought before the ethics committee of the Medical Society and made to account his his actions.

I look forward to your response and recommendations regarding this matter.

 Respectfully,

 William H. Seitz, Jr., M.D.
 Member of Board of Directors
 The Cleveland Academy of Medicine

cc: Cleveland Bar Association
 Attention: Ethics Committee

 Dennis B. Brooks, M.D.
 Chairman, Medical/Legal Committee
 Cleveland Academy of Medicine