OPINION
Appellant, Francesca Gall, appeals the decision of the Trumbull County Court of Common Pleas granting summary judgment in favor of appellee, Trumbull Memorial Hospital.
Appellant began working for appellee in February 1989 as a blood bank technologist in the pathology department on the midnight shift. Despite being given a few weeks of training on new technology contained in the lab, appellant was unable to perform her job in a satisfactory matter, by her own admission. While working in the blood bank on her own, appellant suffered stress and anxiety over her work based on her belief that she was unable to perform her job duties. Consequently, after a few months, appellant was transferred out of the blood bank and to another position in the pathology department until early 1993. At that time, reorganization problems apparently caused her to be reassigned to the blood bank service, the position for which she was originally hired.
On June 9, 1993, appellant sent a letter to Charles Johns ("Johns"), the administrator for appellee, outlining her fear of returning to the blood bank. Although Johns acknowledged receipt of the letter, no change in plans occurred. Thus, appellant was retrained for a period of three weeks and resumed her duties in the blood bank in or about July 1993. On or about December 2, 1993, appellant went on sick leave due to bouts of stress and anxiety. Upon returning to work at the end of December, appellant was notified by Tom Nicolas ("Nicolas"), her immediate supervisor, that if she would not work in the blood bank, she would need to go back on sick leave. Apparently, appellant then went on sick leave.
Early in 1994, appellant contacted her friend Paul Carlson ("Carlson"), who was appellee's vice president, regarding the situation. In a letter dated February 9, 1994, Carlson wrote to appellant and stated that her blood bank duties were an essential job function of her overall position. Therefore, Carlson wrote that appellant would be removed from her position as of February 9, 1994. However, Carlson indicated that there would be an attempt to reinstate appellant to a position where she could perform all duties, and that in the meantime, she would be compensated through accrued sick leave. Once sick leave was exhausted, she could use vacation and holidays so as to maintain her normal level of compensation. Carlson further indicated that appellant could possibly work on an on-call basis in the laboratory, covering shifts for employees on vacation or utilizing sick leave. Once her benefits became exhausted, Carlson indicated that appellant would be placed on a leave of absence without compensation for one year. Finally, the letter indicated that appellant would be placed in the next full or part-time medical technologist position that became available in the lab which did not require blood bank duties. Also, if she refused an offered position that she could perform, then appellee would terminate the employment relationship.
Beginning in March 1994, appellant covered for other employees' shifts as needed. Neither party has indicated where the record demonstrates whether the shifts that appellant covered were in the blood bank or in other areas of the laboratory, or a combination of both. In a directive issued by Joyce Malagisi on March 17, 1994, supervisors were instructed, in a call-off situation, to first call part-timers, and if none were available, then to contact appellant as a replacement. The instructions were again circulated on April 7, 1994.
Effective June 30, 1994, Shirley Ledgerwood, a chemistry department supervisor, retired. Appellant applied for the position, however, she did not get the job as she expected based on her understanding of Carlson's earlier letter. Appellant also began an application for the assistant supervisor position vacated by Anna Beagle, who took Ledgerwood's position. Although, appellant admits that she told the clerk to throw her application out. When she did not get the position, Nicolas told her that she had never applied. Finally, the assistant supervisor position was vacated and filled by Kim Finch ("Finch"). Finch's "med tech" job was not filled by appellant or anyone else. Apparently, that position was eliminated.
Appellant continued working as an on-call technician until December 1994. After being scheduled to work on both Christmas Eve and Christmas Day that year, she went to Nicolas and orally asked for Christmas Day off. Nicolas refused the request. The basis for the refusal was that hospital policy precluded employees to take two personal days in December and appellant had already taken one. Upon being refused, appellant yelled at Nicolas, calling him "evil" and an "egomaniac." As she stormed out of his office, she collapsed and was taken to the emergency room. Two days later, appellee discharged appellant from employment for gross insubordination, which was on or about December 16, 1994.
Appellant instituted a complaint in the Trumbull County Court of Common Pleas on December 14, 1994. On May 10, 1999, appellee filed a motion for summary judgment. A hearing was held on the motion on July 30, 1999. The trial court granted appellee's motion in a three-sentence judgment entry filed August 2, 1999. Appellant now timely appeals, raising the following as error:
 "The trial court erred to the prejudice of the Plaintiff-Appellant by granting the Defendant-Appellee's motion for summary judgment. [sic]"
 In asserting this assignment of error, appellant contends that there were genuine issues of material fact existing as to whether appellee breached an employment contract with her. Appellant further alleges that reasonable minds could conclude that appellee's employees intentionally inflicted emotional distress on her. Finally, appellant states that she was not required to exhaust any administrative remedies before filing her lawsuit.
A motion for summary judgment is governed by Civ.R. 56. Summary judgment must be rendered when "there is no genuine issue as to any material fact" and the "moving party is entitled to judgment as a matter of law." Civ.R. 56(C). Summary judgment shall not be rendered, unless "reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence * * * construed most strongly in the party's favor." Id. If the moving party satisfies its initial burden to identify those portions of the record demonstrating the absence of a genuine issue of fact on a material element of the nonmoving party's claim, then the nonmoving party bears the burden to provide evidence demonstrating a genuine issue of material fact, pursuant to Civ.R. 56(E). Dresher v. Burt (1996), 75 Ohio St.3d 280,296. If the nonmoving party is unable to satisfy this burden, then summary judgment is proper. Id.
In her first claim of error, appellant argues that appellee breached an employment contract with her. Specifically, appellant avers that reasonable minds could conclude that the "written proposal" "accepted" by her, plus oral promises made by Carlson, satisfy the elements of either an express or implied contract for employment.
In order to constitute a contract, express or implied, there must be an offer and an acceptance. Noroski v. Fallet (1982),2 Ohio St.3d 77, 79. A contract will not be formed even if there was an offer and an acceptance without valid consideration.Gruenspan v. Seitz (1997), 124 Ohio App.3d 197, 211. In order for there to be a proper offer and acceptance, parties to a negotiation must have a meeting of the minds. Fallet,2 Ohio St.3d at 79. In Biddle v. Warren Gen. Hosp. (Mar. 27, 1998), Trumbull App. No. 96-T-5582, unreported, at 22, this Court held that a meeting of the minds "is shown by the surrounding circumstances which make it inferable that the contract exists as a matter of tacit understanding."
In reviewing the factual record before this Court, we conclude that appellant and appellee never had more than an employment at-will arrangement. We arrive at this conclusion by considering, based on the facts before us, that appellant's original hiring was for employment at-will. Then, due to her health conditions, appellant went on sick leave during most of the month of December 1993. After returning from sick leave, appellant was unable to perform her blood bank duties, for which she was hired, and was ordered to go back on sick leave. Through these entire events, appellant and appellee maintained an employment at-will relationship.
Moreover, after going on sick leave at the end of December 1993, appellant contacted Carlson, her personal friend and vice president for appellee, and sought his intervention into the situation. It is clear that Carlson removed appellant from her position as of February 9, 1994, as indicated in his letter to her. It is also clear that although she was removed from the position for which she was originally hired, Carlson's actions resulted in appellant being retained in a manner that would allow her to use her sick and vacation time and fill in on an on-call basis, in order to continue receiving her regular rate of pay. Carlson's actions were no more than gratuitous, as there was nothing to indicate that there was any consideration from appellant. Although Carlson stated in his letter that appellant would be placed in the next full or part-time medical technologist position that became available, which did not require blood bank duties, such statement did not transform her relationship with appellee from anything other than employment at-will.
Under employment at-will, appellee was permitted to terminate the employment relationship with appellant for any reason that was not contrary to law. See Mers v. Dispatch Printing Co. (1985),19 Ohio St.3d 100, paragraph one of the syllabus. Finally, appellee severed the relationship with appellant only after she yelled at Nicolas, her supervisor, regarding his refusal to permit her to take Christmas Day off from work. Such termination resulted from appellee's perception that appellant acted in a grossly insubordinate manner. Thus, her termination was for cause.
Due to the fact that this Court interprets the association between appellant and appellee as comprising an employment at-will relationship, no employment contract existed. Moreover, in resolving appellant's first claim of error, we note that, as there has been no contention by her that there existed a bilateral contract, we observe that the thrust of her argument would advance the theory that an implied-in-fact contract existed. We also note that the submissions regarding the interaction between Carlson and appellant are in the nature of an accommodation of her stress-related problems and appear to have been gratuitous. They do not provide the elements of an implied in fact contract as a matter of law. Accordingly, the trial court did not err in granting summary judgment in favor of appellee, because reasonable minds could only conclude that there was no employment contract with appellant for appellee to breach. Thus, appellant's first claim is without merit.
In her second claim, appellant states that summary judgment was inappropriate because reasonable minds could conclude that appellee intentionally inflicted emotional distress upon her. Appellant bases her claim for emotional distress on the alleged outrageous conduct by Nicolas and Carlson.
In Phung v. Waste Mgt. Inc. (1994), 71 Ohio St.3d 408, 410, the Ohio Supreme Court held that in order to prove intentional infliction of emotional distress, a plaintiff must show: "(1) that the defendant intended to cause the plaintiff serious emotional distress, (2) that the defendant's conduct was extreme and outrageous, and (3) that the defendant's conduct was the proximate cause of plaintiff's serious emotional distress." In defining "extreme and outrageous" conduct, the Supreme Court of Ohio adopted the definition provided in the Restatement of Torts 2d and stated that liability has been found only where the conduct has been so outrageous that is goes beyond all possible bounds of decency and is so atrocious that it is "utterly intolerable in a civilized society." Reamsnyder v. Jaskolski (1984), 10 Ohio St.3d 150,153.
With regard to the "extreme and outrageous" conduct standard set forth in the second prong of Phung, case law indicates that only rarely will offensive conduct reach that level necessary to support a claim for intentional infliction of emotional distress. For example, in Keefe v. Youngstown Diocese of the Catholic Church
(1997), 121 Ohio App.3d 1, 9, the Fifth District Court of Appeals concluded that reasonable minds could only conclude that the conduct which the appellant endured was not "extreme and outrageous" for purposes of succeeding on a claim for intentional infliction of emotional distress. In that case, the appellant served as a secretary at a parochial school and had informed a high level school official that she suspected Judith Bogdan, the school's principal, of paying certain teachers from a special account and had failed to take required tax deductions from the pay of those teachers. Consequently, after making her report, Ms. Bogdan began treating her miserably by refusing to speak to the appellant, by denying her access to school files, by failing to inform the appellant of her whereabouts during school hours, and by taking away many of her job responsibilities.
However, in Hampel v. Food Ingredients Specialties (Oct. 29, 1998), Cuyahoga App. No. 73143, unreported, at 22, the Eighth District Court of Appeals determined that the appellant's actions, through its employee Jerry Hord, were legally sufficient for a jury to conclude that they constituted extreme and outrageous behavior. In that case, the appellee suffered emotional distress after Mr. Hord, his supervisor, had on one occasion told the appellee to perform explicit sexual acts on him, in front of his co-workers after complaining about not having enough bins in which to put certain products. During that encounter Mr. Hord rephrased his previous comment and repeated it to appellee. Several additional comments consisting of similar content followed from Mr. Hord during the incident. After reporting the incident to higher level management, Mr. Hord was given a written warning and was forced to apologize, but remained the appellee's supervisor and consequently subjected the appellee to a higher standard than the other employees. Moreover, when the appellee finally was able to get his shift changed, Mr. Hord tormented him by threatening to follow him to the other shift.
In the instant matter, assuming arguendo, that the first and third prongs of the emotional distress test articulated in Phung
were met, appellant's claim must fail because the second prong was not satisfied. Indeed, the conduct of appellee's employees was not extreme and outrageous. Appellant states that Nicolas harassed and intimidated her. The record reveals that this statement is entirely unsubstantiated. There is nothing in the record, and appellant does not allege, that any employee of appellee ever made the type of vulgar and disparaging remarks that were made in Hampel. Nor were any threats made to appellant. Finally, no one tormented appellant by holding her to a higher standard of work, as compared with other employees. In fact, the record indicates that appellant was accommodated by Carlson and Nicolas by virtue of keeping her employed and authorizing her to use her vacation and sick leave to maintain her normal level of compensation while waiting for an appropriate position.
Appellant further argues that despite her known sensitivity to working in the blood bank, Nicolas ordered her to work in the lab. The record shows that appellee made several attempts to accommodate appellant's particular sensitivity, as evidenced by appellant's transfer out of the blood bank to another position in the pathology department until early 1993. When reorganization problems occurred within the hospital, she was required to perform limited blood bank services for which she was originally hired. In an attempt to lessen appellant's anxiety, appellee spent three weeks retraining her. Finally, after going on sick leave due to the blood bank assignment, appellant was provided an opportunity by Carlson to not lose her job by working on-call for non-blood bank shifts and by being permitted to continue to accrue and use vacation and sick time until another position opened that was more suitable for her.
There is nothing in the set of facts here which indicates that employees for appellee acted with extreme and outrageous conduct toward appellant. Based on this record, there are no evidential submissions which support the claim that appellee, by and through its employees, acted in a manner so outrageous that it went beyond all possible bounds of decency and was so atrocious that the demand that she work in the blood bank was one that was utterly intolerable in a civilized society. Thus appellant's second claim is not well-taken.
In the third claim of error, appellant avers that she was not required to exhaust any administrative remedies before filing her lawsuit. Based upon the treatment of this case in the preceding two assignments of error, this argument is rendered moot.
For the foregoing reasons, appellant's assignment of error is without merit. Therefore, the judgment of the Trumbull County Court of Common Pleas is affirmed.
 ____________________________________ PRESIDING JUDGE DONALD R. FORD
CHRISTLEY, J., O'NEILL, J., concur.