4447 ASSOCIATES, a Utah general partnership; and Zions First National Bank, a national banking association; Plaintiffs and Appellant,

v.

FIRST SECURITY FINANCIAL, a Utah corporation, Defendant and Appellee.

No. 930293–CA.

Court of Appeals of Utah.

Jan. 6, 1995.

Jeffrey M. Jones and J. Mark Gibb, Salt Lake City, for appellant.

Craig Carlile and Brent D. Wride, Provo, for appellee.

Before BILLINGS, ORME and WILKINS, JJ.

## OPINION

ORME, Presiding Judge:

Plaintiff 4447 Associates appeals the trial court's judgment that defendant First Security Financial, as an account debtor, is not responsible to 4447 Associates under an assignment of the account for security. We affirm in part, reverse in part, and remand.

## FACTS

In December 1982, First Security Financial and Capitol Thrift and Loan entered into an asset purchase agreement, whereby First Security purchased substantially all of Capitol's assets for $1,379,911. Under the agreement, First Security paid $200,000 to Capitol at closing, with interest payments due quarterly and the remaining principal due in December 1985.[1] This deferred principal payment was subject to an offset, not to exceed $1,000,000, based on any subsequent reduction in the transferred assets' value prior to the 1985 due date. Also, Richard Christenson, Capitol's majority shareholder, was named president of First Security, but still retained the presidency of Capitol until June 1984.

---

1. At closing, the parties reduced the purchase price to $1,207,777.42, leaving $1,007,777.42 as the deferred balance.

In June 1984, Capitol stockholders, including Christenson, sold all their interest and the remaining assets of Capitol, which consisted of its receivable from First Security and its charter, to AFS Holding Company, an affiliate of the Bertagnole Investment Company. Emanuel Floor, a Bertagnole partner, replaced Christenson as president of Capitol.

On September 28, 1984, Bertagnole reached agreement with Zions Bank to restructure Capitol's pre-existing debt to Zions of $870,000 into a $1,000,000 revolving loan. To secure the loan, Capitol assigned Zions its rights to the payments due from First Security under the purchase agreement. In conjunction with the loan re-negotiation, Zions commercial loan officer Allen Potts and Bertagnole Management Company vice-president Ronald Mitchell obtained Christenson's personal guaranty for $870,000, the amount of the original Capitol debt owed to Zions. Floor executed a notice of assignment[2] as part of the loan documentation, and testified that all the documents were taken by Bertagnole employees to be delivered, filed, or recorded as appropriate. Potts testified that he instructed his secretary at Zions to mail a copy of the notice of assignment to First Security as per the address specified in the asset purchase agreement for giving notice to First Security, which included the notation "Attn: Treasurer." He did not instruct that the mailing be registered or certified.[3] Elmer Tucker, First Security's treasurer during this period, never received the notice and had no knowledge of the assignment until 1986. Zions never obtained acknowledgement from First Security that it had received notice of the assignment or of its purported obligation to make future payments jointly to Zions and Capitol, and Zions apparently never followed up with a written or verbal inquiry as to whether First Security received the

notice. Nor, apparently, did Zions complain or inquire when, at the next scheduled quarterly payment, it did not see a check from First Security on which Capitol and Zions were shown as joint payees.

In November 1984, Christenson was terminated as president of First Security, and some time between December 1984 and July 1985, he regained the position as president of Capitol that he had relinquished in June 1984, incident to the Bertagnole buyout. In order to resolve disagreements related to Christenson's departure from First Security, Christenson, Capitol, and First Security entered into a settlement agreement on July 10, 1985. Among its terms was an agreement by both Capitol and Christenson to release First Security from all remaining obligations under the 1982 asset purchase agreement, specifically including payment of the principal balance due. In conjunction with his negotiations with First Security, Christenson delivered three personal financial statements prior to July 1985. On each statement, Christenson listed as an asset his interest in Capitol's receivable from First Security, with the notation that the "receivable has been pledged to Zion's First National Bank."

Capitol had made payments, via checks from Bertagnole, on its restructured Zions loan, but defaulted in December 1985. Zions notified First Security on February 14 and 19, 1986, that Capitol had defaulted and that Zions "may be looking" to its security interest in First Security's payment obligations under the 1982 asset purchase agreement. In response, First Security, which denied receipt of any prior notice of the assignment, informed Zions that its debt to Capitol had been fully discharged as part of the July 1985 settlement accord.

**2.** Capitol's notice stated, in part, as follows:

Notice is hereby given that Capitol ... has assigned to Zions ... for purposes of security, and granted to Zions a security interest in all amounts owing to Capitol and all rights of Capitol to receive payment from First Security Financial pursuant to the aforesaid Asset Purchase Agreement....

You are hereby requested and instructed to make all future payments pursuant to said

Asset Purchase Agreement payable jointly to Capitol and Zions.

**3.** Zions's office procedure for handling mail is similar to that of many large offices. Zions employees who prepare letters for mailing leave them unstamped at designated locations to be picked up and delivered to a central mail room. There, other employees affix the appropriate postage and deposit the mail with the post office at the end of the work day.

On March 4, 1987, Zions filed a complaint against First Security, seeking a determination of the amount owed to Capitol by First Security under the asset purchase agreement and an order requiring First Security to pay Zions, as Capitol's assignee, this amount. First Security filed a motion seeking a partial summary judgment on February 23, 1990. The trial court granted the motion, holding that pursuant to the asset purchase agreement's provision for a "change in value" offset to the principal payment due in December 1985, the amount due must be adjusted downward by $1,000,000, the maximum amount permitted under the agreement, given the uncontroverted evidence.

4447 Associates, the sole appellant in this case, first acquired a stake in these proceedings when it purchased a participation interest in the Capitol note and collateral from Zions in late 1986. In June 1990, Zions assigned to 4447 Associates all of its remaining right, title, and interest in the Capitol note.[4]

The issues surviving the partial summary judgment were tried to the court on January 6 and 7, 1992. Subsequently, the trial court issued its Memorandum Decision and Findings of Fact and Conclusions of Law, and entered a judgment in favor of First Security on November 3, 1992. The trial court found that First Security had no duty to pay Zions, as assignee of Capitol's account receivable, or to notify Zions of its intent to settle its obligation to Capitol. 4447 Associates now appeals.

### ISSUES

4447 Associates raises the following issues on appeal that merit discussion: (1) whether the trial court erred in finding that First Security did not have notice of the assignment of its Capitol obligation to Zions prior to entering into a settlement agreement that

extinguished the obligation; (2) whether the trial court erred in concluding that, even with knowledge of the assignment, First Security had no duty to obtain consent from Zions prior to entering into the settlement agreement; and (3) whether the trial court erred in its partial summary judgment determination that the value offset provision of the asset purchase agreement reduced the remaining principal due by $1,000,000.[5]

### STANDARDS OF REVIEW

We employ several standards of review in resolving this appeal. We review the trial court's decision to grant partial summary judgment "for correctness, according no deference to the trial court's legal conclusions." *Christensen v. Swenson*, 874 P.2d 125, 127 (Utah 1994). *Accord Brown v. Weis*, 871 P.2d 552, 559 (Utah App.1994). "Summary judgment is appropriate when the record indicates that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Christensen*, 874 P.2d at 127. "In addition, we [examine] all relevant facts and all inferences arising from those facts in the light most favorable" to the non-moving party. *Id.*

Because 4447 Associates would materially benefit from a favorable determination of its rights as an assignee seeking to enforce an assignment, it bore the burden of proving First Security received notice of the assignment. *See Bank of Salt Lake v. Corporation of the President of the Church of Jesus Christ of Latter–Day Saints*, 534 P.2d 887, 891 (Utah 1975). *See also Winegar v. Froerer Corp.*, 813 P.2d 104, 108 (Utah 1991) (party asserting that another party assumed assignor's liabilities has burden of proving assumption); *First Inv. Co. v. Andersen*, 621 P.2d 683, 687 (Utah 1980) (assignee of non-

---

4. Thus, 4447 Associates emerged in an unenviable position: the assignee of an assignee of a right to payment that was purportedly extinguished by the parties to the underlying transaction before anything was ever realized on the assignment.

5. The parties also debate the question of whether First Security ever received, beyond mere notice of the assignment, notice to make payment di-

rectly to Zions as contemplated in Utah Code Ann. § 70A–9–318(3) (1990). It clearly did not, and we decline to address the issue further. *See, e.g., State v. Carter*, 776 P.2d 886, 888–89 (Utah 1989) (declining to consider issues without merit); *State v. Vigil*, 840 P.2d 788, 795 (Utah App. 1992) (same), *cert. denied*, 857 P.2d 948 (Utah 1993).

negotiable notes has burden of proving maker issued notes for consideration); *Peoples Fin. & Thrift Co. v. Landes,* 28 Utah 2d 392, 503 P.2d 444, 446 n. 3 (1972) (assignee of account receivable has burden of proving account debtor had notice of assignment).

 A determination concerning whether a party had notice or knowledge of a particular transaction or occurrence is a finding of fact and "will not be set aside unless clearly erroneous." Utah R.Civ.P. 52(a). *See Kasco Servs. Corp. v. Benson,* 831 P.2d 86, 89 (Utah 1992) (receipt of notice of anticipatory repudiation is a question of fact). In order to challenge findings of fact, the appellant must marshall all evidence supporting "the findings and then demonstrate that despite this evidence, the trial court's findings are so lacking in support as to be 'against the clear weight of the evidence.'" *Mountain States Broadcasting Co. v. Neale,* 783 P.2d 551, 553 (Utah App.1989) (quoting *In re Bartell,* 776 P.2d 885, 886 (Utah 1989)). However, a determination concerning the *effect* of the notice presents a question of law, reviewed for correctness. *Kasco,* 831 P.2d at 89.

### SUMMARY JUDGMENT ON THE ASSET VALUE OFFSET

 As indicated, First Security filed a motion for partial summary judgment, contending that, as a matter of law, the terms of the asset purchase agreement provided for a downward adjustment in the amount of $1,000,000, to be applied to the principal payment owed by First Security and due in December 1985.[6] The asset purchase agreement provided, in part, as follows:

> At the end of the three (3) year period of deferral and prior to the payment of the principal amount of the deferred portion of the purchase price, the real estate and receivables of Capitol acquired by FS Financial shall be valued in the manner set forth below. In the event that (i) the aggregate value of the real estate is less than its book value as of the Closing Date

and/or (ii) the actual and anticipated losses on the collection of the amount of the receivables as of the Closing Date exceeds the reserve for losses as of the Closing Date, the principal amount of the deferred portion of the purchase price shall be adjusted downward in an equivalent amount. Further, the principal amount of the deferred portion of the purchase price shall also be adjusted downward in the amount of any liabilities of Capitol relating to the collection of receivables which were incurred in the normal course of business prior to Closing but were not disclosed on Capitol's balance sheets at Closing and which were assumed by FS Financial hereunder. The aggregate of such downward adjustments of the principal amount of the deferred portion of the purchase price shall in no event exceed One Million Dollars ($1,000,000.00).

4447 Associates incorrectly asserts that the downward adjustment in value is to be calculated on the asset purchase agreement closing date of December 13, 1982, and not on the payment due date of December 13, 1985, and that First Security's evidence did not show a decrease in value as of the earlier closing date. In support of its assertion, 4447 Associates points to certain terms of the agreement, but fails to include a critical sentence that states the adjustment is to be calculated "[a]t the end of the three (3) year period of deferral and prior to the payment of the principal amount of the deferred portion of the purchase price." Read in its entirety, the contract unambiguously states that the adjustment in value is to be done three years *after* the closing date of December 13, 1982. *See Homer v. Smith,* 866 P.2d 622, 629 (Utah App.1993) (according clear and unambiguous contract terms "their plain and ordinary meaning without resorting to extrinsic evidence"), *cert. denied,* 878 P.2d 1154 (Utah 1994).

Moreover, although 4447 Associates challenges the validity of First Security's calculations supporting its claim of decreased asset

---

**6.** According to the closing statement, signed December 13, 1982, which finalized the asset purchase agreement between First Security and Capitol, the deferred principal due in December

1985 was $1,007,777.42. *See supra* note 1. With application of the maximum $1,000,000 offset for the decline in asset value, the principal balance owing would become $7,777.42.

value, 4447 Associates offers no contrary affidavits or evidence to rebut these calculations. Thus, we are unable to find any evidence favorable to 4447 Associates that would create an issue of material fact.

Accordingly, the trial court was correct in its interpretation of the asset purchase agreement offset provision and in its decision to grant partial summary judgment in favor of First Security. We turn now to the notice issues.

## NOTICE OF ASSIGNMENT GENERALLY

■ Our starting point is Article 9 of the Uniform Commercial Code (UCC), pertaining to secured transactions.[7] *See* Utah Code Ann. §§ 70A-9-101 to -507 (1990 & Supp. 1994). In particular, section 70A-9-318 addresses assignments of security interests in accounts, and states, in part, as follows:

Unless an account debtor has made an enforceable agreement not to assert defenses or claims arising out of a sale . . . the rights of an assignee are subject to:

> (a) all the terms of the contract between the account debtor and assignor and any defense or claim arising therefrom; and
> (b) any other defense or claim of the account debtor against the assignor which accrues *before* the account debtor receives notification of the assignment.

Utah Code Ann. § 70A-9-318(1) (1990) (emphasis added).

■ Thus, in the context of an assignment, section 9-318 distinguishes between claims and defenses arising from the contract and other unrelated claims and defenses. An account debtor can assert claims and defenses based on the terms of the contract whether they arise before or after notification of an assignment. However, subsection (1)(b) lim-

its assertion of unrelated claims and defenses to those "which accrue[ ] *before* the account debtor *receives notification of the assignment.*" *Id.* § 70A-9-318(1)(b) (emphasis added). *See also West One Bank v. Life Ins. Co.*, 887 P.2d 880, 885 n. 7 (Utah App.1994) (secured creditor need only give notice of its interest in order to have priority over later creditor's subsequent right of setoff). Subsection (1)(b) does not specify a particular form of notice, but simply precludes an account debtor from raising a claim or defense against an assignee after the account debtor is aware that the assignment exists.[8]

■ In the case at hand, First Security's $1,000,000 offset for the decreased value of the assets arose directly from the contract terms of its asset purchase agreement with Capitol. When Zions took Capitol's interest in the asset purchase agreement, its interest was subject to the terms of the original contract between First Security and Capitol, regardless of whether First Security had notice of the assignment. At issue here is whether First Security was able to extinguish the debt remaining after the $1,000,000 offset by asserting a claim or defense not arising from its original contract with Capitol. According to the terms of section 9-318(1)(b), First Security, as an account debtor, can only succeed if its claim or defense accrued before it received notice of the assignment's existence. Thus, we now consider whether First Security received notice of the assignment prior to extinguishing the debt as part of its settlement with Capitol and Christenson.

## FIRST SECURITY'S NOTICE OF THE ASSIGNMENT

The UCC defines notice and the related concept of knowledge of a fact as follows:

7. All 50 states have adopted the bulk of the Uniform Commercial Code, *see* 3A *Uniform Laws Annotated (U.C.C.)* 1–2 (1992), developed by the National Conference of Commissioners on Uniform State Laws with later assistance from the American Law Institute. James J. White & Robert S. Summers, *Handbook of the Law Under the Uniform Commercial Code* § 1 (1972). Comparable provisions with identical wording, or at least the same substantive meaning, exist in most of the various state statutory schemes. Thus, other courts' interpretations of their commercial codes may be helpful in our resolution of this appeal.

8. The two-pronged notice requirement mandated by Utah Code Ann. § 70A-9-318(3) (1990) is not applicable to our analysis. Section 9-318(3) sets forth the notice requirements for an assignee to receive payments directly from the account debtor. In the instant case, the question of whether Zions was entitled to receive payments from First Security as they came due does not merit consideration. *See supra* note 5.

A person has "notice" of a fact when:

(i) he has actual knowledge of it;

(ii) he has received a notice or notification of it; or

(iii) from all the facts and circumstances known to him at the time in question he has reason to know that it exists.

A person "knows" or has "knowledge" of a fact when he has actual knowledge of it.

Utah Code Ann. § 70A–1–201(25)(a), (b) (1990). Furthermore, one gives notice by taking such steps as may be reasonably required to inform the other person in ordinary course whether or not the other person actually comes to know of it.

A person "receives" a notice or notification when:

(i) it comes to his attention; or

(ii) it is duly delivered at the place of business through which the contract was made or at any other place held out by him as the place for receipt of such communications.

*Id.* § 70A–1–201(26)(a), (b). The trial court concluded that

First Security never received adequate, legal notice of the Assignment sufficient to impose an obligation on First Security which would preclude First Security from satisfying its obligations under the Purchase Agreement directly with Capitol, the original account creditor.

As the debate has been drawn by the parties in this appeal, there are three means by which First Security could have learned of the assignment sufficient to satisfy section 1–201(26): by the written notice prepared by Floor; through the personal knowledge of Christenson, who for a time was First Security's president; and from the notation on Christenson's financial statements submitted to First Security as part of the negotiations culminating in the settlement agreement.[9]

### A. Written Notice

The written notice prepared by Floor failed to provide adequate notice, since there is no evidence that First Security received it. Neither Capitol nor Zions mailed it registered or certified, and Zions did not secure written or oral acknowledgement of receipt from First Security. It is undisputed that the notice, addressed to the treasurer of First Security, was not received by then-treasurer Elmer Tucker. At least with respect to this document, the trial court did not err in finding that "[n]o individual representing or authorized to act on behalf of First Security received written notice of the assignment prior to 1986."

### B. Knowledge of Christenson

■ Of course, the knowledge of Christenson, president of First Security when the assignment to Zions was made by Capitol, can be imputed to First Security.[10] *See, e.g.,*

---

9. Zions perfected its security interest by filing a UCC–1 financing statement with the Utah Department of Commerce. While filing a financing statement is constructive notice that is effective for other purposes under Article 9, *see* Utah Code Ann. § 70A–9–312(5)(a) (1990) (establishing priority among multiple security interests by date of filing), it does not suffice for the actual notice required under section 70A–9–318. A financing statement only offers notice that a security interest may exist, and requires potential creditors to make further inquiry to confirm the existence or specific details of the transaction. *See Sannerud v. First Nat'l Bank,* 708 P.2d 1236, 1241 (Wyo. 1985); U.C.C. § 9–402 cmt. 2 (1989). An account debtor, unlike a potential creditor, is not obligated to check the UCC recordings continually to ascertain whether the debt has been assigned, and the filed financing statement offers no actual notice of the assignment's existence that would affect an account debtor's right to assert subsequent claims and defenses. *See* Utah Code Ann. § 70A–9–318(1)(b) (1990); *Chase*

*Manhattan Bank v. State,* 40 N.Y.2d 590, 388 N.Y.S.2d 896, 898–99, 357 N.E.2d 366, 369 (1976) (financing statement not actual notice that would bar account debtor from asserting setoff).

10. First Security incorrectly argues that even if Christenson received notice, it was only through Capitol-related business dealings with Zions and not in his capacity as an officer of First Security. According to the UCC, one can receive notice when "it comes to his attention," Utah Code Ann. § 70A–1–201(26)(b)(i) (1990), regardless of the circumstances through which the notice was received. Additionally, although Christenson may have been "wearing two hats," given the intertwined financial relationship of Christenson, Capitol, and First Security, both hats were cut from the same cloth. Thus, the fine distinction First Security seeks to draw is untenable. If Christenson knew of the assignment at any time when he was president of First Security, then First Security knew of ·the assignment. *How* Christenson knew is irrelevant.

*Tuft v. Federal Leasing Inc.*, 657 P.2d 1300, 1303 (Utah 1982) (corporate officers' knowledge of foreclosure suit imputed to corporation). It is evident that Christenson knew of the assignment by the time, some ten months after the assignment, that he agreed to the settlement with First Security. Still, there is nothing in the record to show he knew during his tenure as First Security president, which ended less than two months after the assignment was made. 4447 Associates points to the fact that Christenson was a party to various discussions relative to Capitol's effort to refinance its obligations to Zions and understood that the assignment to Zions of Capitol's right to payment from First Security was under discussion. However, the only document Christenson signed when the refinance arrangement was concluded was a limited personal guaranty of Capitol's payment to Zions. There was no testimony showing that he had knowledge of other aspects of the finalized transaction, specifically an actual assignment by Capitol of its right to payment from First Security. As the trial court found, the discussions between Potts and Christenson concerned "an *intent* by Zions to enter into the agreement, [and preceded] execution of the Assignment by Capitol and Zions."

We agree with the trial court that it is not enough that Christenson knew Zions hoped to receive an assignment as security for repayment of Capitol's loan and that Capitol was willing to make such an assignment— Christenson had to know the assignment had actually been made. Thus, 4447 Associates failed to meet its burden of proving Christenson knew the assignment had been made at a time when he was also serving as First Security's president.

### C. Financial Statements

However, notification through Christenson's submission to First Security of financial statements referring to the assignment, submitted in conjunction with the settlement agreement that purportedly extinguished the underlying debt between First Security and Capitol, cannot be dismissed as easily.

A financial institution receives many financial statements in the course of its business, which clerical personnel may simply examine for compliance with the institution's lending guidelines. It would be too burdensome, as First Security contends, to expect scrutiny of footnotes in every financial statement submitted to ascertain the existence of an encumbering security interest that might affect the affairs of the receiving financial institution, no matter how remote from the transaction for which the financial statement was submitted.

These particular financial statements, however, were submitted in the course of negotiations between Christenson and First Security to settle their respective legal differences and not in the ordinary course of First Security's general lending business. Furthermore, the notation stating that the "receivable has been pledged to Zion's First National Bank" concerned an asset that was at the core of the negotiations which culminated in the settlement agreement. Thus, there was a uniquely close nexus between the revelation in the financial statements and the main purpose of the settlement agreement.

In addition, the trial court's factual findings confirm that First Security had notice through its receipt of the financial statements. The court noted the reference to the assignment in Christenson's financial statements, and also found that at least one statement "was delivered by Christenson's attorney to First Security's attorneys prior to July, 1985." Both First Security and 4447 Associates had stipulated to these facts, as well as to the evidence upon which the trial court based its findings. The court received as evidence correspondence between counsel for First Security and counsel for Christenson that indicated such a delivery; moreover, the exchange of letters was made in the context of documenting the settlement which featured the purported release of the very right to payment that the financial statement showed had been assigned to another. Counsel for First Security, acting as its agent, therefore received the financial statement and would have noted the assignment of the account in the course of examining the financial statement. *See First Sec. Bank v. Banberry Dev. Corp.*, 786 P.2d 1326, 1333

(Utah 1990) (describing fiduciary relationship between attorney and client).

Therefore, the trial court incorrectly concluded, contrary to its own findings of fact, that "First Security never received adequate, legal notice of the Assignment sufficient to impose an obligation on First Security." The notation on the financial statements indicating Zions's interest in the account was sufficient to confer actual notice of the assignment on First Security. Accordingly, First Security was not free to extinguish the account in the context of the settlement agreement with Capitol and Christenson, for reasons not contemplated in the underlying contract, without the consent of Zions.[11]

## DUTY IMPOSED BY NOTICE

 The trial court in the instant case made the following conclusion pertinent to any duty imposed on First Security through actual knowledge or notice of the assignment's existence:

Knowledge of the existence of the Assignment alone, if any such knowledge existed, did not impose a duty to inquire on First Security.

This conclusion does not ring true. A familiar principle of the law, particularly in secured transactions, is that actual knowledge of another's property interest may limit one's right to acquire or interfere with that property. *See, e.g.,* Utah Code Ann. § 70A–9–301(1)(c), (d) (1990) (buyer not in ordinary course of business purchases collateral free of an unperfected security interest only if buyer has no actual knowledge of interest).[12]

Accordingly, since a secured creditor acquires a personal property right, *see id.* § 70A–1–201(37)(a), actual knowledge of the assignment's existence precludes substantial interference with the assignee's rights. Legal commentators have noted that under the UCC, an assignee's rights may be adversely affected by contract modifications made by the account debtor and the assignor, but such actions are "unwarranted" if the assignee's rights are jeopardized by termination of the contract or similar unilateral action. 9 Hawkland, Lord & Lewis, *UCC Series* § 9–318:01 (Callaghan 1991). *See also In re Apex Oil Co.,* 975 F.2d 1365, 1370 (8th Cir.1992) (holding company acted unreasonably by setting off debt after receiving notice of third party's security interest in same debt).

Given these principles and a plain reading of section 9–318(1)(b), which allows an account debtor to raise claims and defenses against the assignee not arising from the original contract only *before* it receives notice of the assignment, the trial court incorrectly concluded that knowledge alone did not impose any duty upon First Security.[13] We hold that First Security had a duty to notify Zions of the pending settlement with Capitol and Christenson. Its failure to do so entitles 4447 Associates to an award of damages resulting therefrom, presumably the amount due on the account, as properly reduced in accordance with the terms of the asset purchase agreement as discussed above.

---

11. We do not suggest that an account cannot be modified in any way after notice of assignment is received. The account debtor and the assignor are free to make changes as provided by the original account contract or which may be commercially reasonable within the context of the transaction. However, in this case the settlement agreement in this case unilaterally extinguished the account in an effort to resolve legal differences totally unrelated to, and not contemplated in, the original contract.

12. Likewise, in the context of property law, actual knowledge is a critical factor. For example, the doctrine of equitable subrogation cannot be used by a subsequent lender to trump a prior intervening lien if the lender had actual knowledge of the lien. *Richards v. Security Pac. Nat'l Bank,* 849 P.2d 606, 609 (Utah App.), *cert. denied,* 859 P.2d 585 (Utah 1993). A subsequent purchaser of land cannot cut off a prior unrecorded interest in the land if the purchaser had personal knowledge of the prior conveyance. *Utah Farm Prod. Credit Ass'n v. Wasatch Bank,* 734 P.2d 904, 906 n. 2 (Utah 1987).

13. "[I]f the obligation assigned could be obliterated or diminished by events happening after the assignment and notice of the assignment to the obligor, the assignment would be precarious collateral." *Seattle–First Nat'l Bank v. Oregon Pac. Indus., Inc.,* 262 Or. 578, 500 P.2d 1033, 1035 (1972) (en banc). *See also* Larry D. Bishop, Note, *Commercial Transactions: Protection of the Account Debtor Within and Without UCC § 9–318(1),* 35 Okla.L.Rev. 415, 420–25 (1982) (explaining rights and responsibilities of account debtor after receiving notification of assignment).

## CONCLUSION

We affirm the trial court's decision to grant partial summary judgment in favor of First Security, thereby allowing the value adjustment of $1,000,000 on the principal amount owed by First Security under the asset purchase agreement. We conclude that notice of an assignment's existence precludes an account debtor from extinguishing the account post-assignment, and thereby substantially interfering with the assignee's interest, for reasons other than those contemplated by the terms of the underlying obligation. First Security had such notice through the financial statement submitted to its attorneys.

Accordingly, we reverse in part and affirm in part, and remand to the trial court for entry of an appropriate judgment in favor of 4447 Associates in accordance with this opinion.

BILLINGS and WILKINS, JJ., concur.