**PHD, INC., Plaintiff,**

v.

**COAST BUSINESS CREDIT, Defendant.**

**No. 1:99CV1382.**

United States District Court, N.D. Ohio, Eastern Division.

March 19, 2001.

M. Colette Gibbons, Michael H. Diamant, Stuart L. Larsen, Kahn, Kleinman, Yanowitz & Arnson, Cleveland, OH, Plaintiff.

John Winship Read, Bruce P. Batista, Vorys, Sater, Seymour & Pease, Cleveland, OH, Peter C. Sheridan, Seong Kim, Christensen, Miller, Fink, Glaser, Weil & Shapiro, Los Angeles, CA, for Defendant.

## MEMORANDUM OF OPINION

MANOS, District Judge.

Before this Court are both parties' Motions For Partial Summary Judgment (Docket Nos. 25 and 27). For the following reasons, both motions are GRANTED IN PART AND DENIED IN PART.

## I. FACTS

PHD, Inc. ("PHD"), plaintiff, is a national distributor of various houseware and consumer products. This action arises out of its relationship with non-party Kent & Spiegel Direct, Inc. ("Kent"), a manufacturer of such products.

From about April 1996 through about April 1998, the Plaintiff purchased goods from Kent on account for resale to national department stores. In this capacity, the Plaintiff directly dealt with the retailers regarding Kent's products, and would pass Kent's promotional materials on to the retailers. The Plaintiff alleges that pursuant to the purchase orders for Kent's products, it had the right to impose credits on payments to Kent for such things as (1) defective goods returned by consumers, (2) nondefective products returned unsold by the retailers, (3) price reductions required to remain competitive (referred to as "price protection amounts"), and (4) promotional and advertising allowances. The Plaintiff alleges that it routinely took such credits without objection from Kent.

In addition, under separate contracts executed on April 18, 1996 and March 17, 1997, the Plaintiff performed various services for Kent. Such included inventory warehousing and management, shipping, order filling, storage, and handling of consumer claims for defective goods. The Plaintiff refers to these services collectively as the "Fulfillment Services". Under their relationship, therefore, payments flowed in two directions: the Plaintiff paid Kent for the goods to be resold, and Kent separately paid the Plaintiff for performing the Fulfillment Services.

In early 1998, Kent experienced financial difficulties. In its brief, the Plaintiff states that in "May 1998, [Kent] was literally begging PHD to make payment on invoices" for the goods it purchased. (Plaintiff's Memorandum of Law at 6.) The Plaintiff refused because it claimed that it was entitled to reductions in payment for credits allegedly permissible under various provisions of the purchase orders as described above. The Plaintiff refers to such credits collectively as the "recoupment claim". The Plaintiff also refused to pay because it was still owed money for the Fulfillment Services.

On May 21, 1998, Kent filed a petition for Chapter 11 bankruptcy in the Central District of California, where its business was headquartered. One week later, it brought an adversary proceeding in the bankruptcy court against the Plaintiff for collection of the money still owed on the account for the purchases of Kent's products. During the adversary proceeding, the Plaintiff asserted its claims against Kent for recoupment based on purchase order credits, and for setoff based on delinquent payments for the Fulfillment Services. Despite the bankruptcy, the Plaintiff continued to provide the Fulfillment Services on promises of a continued business relationship after Kent reorganized. The alleged promises were never fulfilled because Kent's petition was later amended to a Chapter 7 liquidation. Kent never paid for the post-petition Fulfillment Services.

Coast Business Credit ("Coast"), defendant, is a California bank that loaned over $8 million dollars to Kent. The loan was collateralized by the accounts receivable, including those relating to the Plaintiff's purchases of Kent's products. On February 24, 1999, the Defendant filed a Notice of Exercise of Collection Rights indicating its intent to collect on the accounts receivable. It also filed a Notice of Substitution in which it substituted itself for Kent in the adversary proceeding in the bankruptcy court.

On May 14, 1999, the Plaintiff filed this declaratory judgment action in the Common Pleas Court for Cuyahoga County, Ohio. It generally claims that the total amount Kent owes to the Plaintiff, based on the recoupment claim for purchase order credits as well as money still owed for the Fulfillment Services, *exceeds the amount owed to Kent* on products purchased by the Plaintiff for resale. Furthermore, the Plaintiff alleges that its claims against Kent are recognizable against Defendant Coast as the secured creditor in Kent's accounts receivable. Accordingly, the Plaintiff owes the Defendant nothing.

On June 3, 1999, the bankruptcy court issued an order abstaining from considering the issues between the parties. The bankruptcy court concluded that Coast was severely undersecured, and that the issues between PHD and Coast arose only under state law:

The adversary matter is a core proceeding *wherein all issues concern state law and not federal or bankruptcy law.* A civil action filed by PHD, Inc. against Coast Business Credit concerning the very same issues existing in this adver-

sary matter is pending the Court of Common Pleas, Cuyahoga County, Ohio. Coast has heretofore been granted relief from the automatic stay so that it may foreclose upon and act with regard to its collateral as a severely undersecured creditor in this bankruptcy case. *This is a related case among third parties not arising under Title 11. It appears that the issues can as readily be resolved in the state court.*

(Order dated June 3, 1999 at 1, emphasis added).

On June 9, 1999, the Defendant removed the state court action to this Court pursuant to 28 U.S.C. § 1332 (diversity jurisdiction). It generally alleges that the Plaintiff's claims against Kent may not be applied to reduce the amount recoverable by the Defendant under the accounts receivable.

The Plaintiff admits that it did not pay Kent for $2,539,625.44 worth of goods.[1] However, it claims that Kent owes it (1) $1,112,569.13 for unpaid Fulfillment Services, and (2) $1,624,422.23 on the recoupment claim for purchase order credits. The Plaintiff seeks to setoff these amounts against the Defendant's claim under Kent's accounts receivable. Because the total amount Kent owes the Plaintiff exceeds the amount the Plaintiff owes Kent, the Plaintiff generally alleges that it owes the Defendant nothing.

Only a portion of the amounts sought to be setoff are at issue in the current motions. Specifically, the parties have briefed whether the total amount for unpaid Fulfillment Services should be setoff, as well as a portion of the recoupment claim which the parties refer to as the

---

1. The Defendant states that the accounts receivable may total as much as about $2.7 million, but it has accepted the Plaintiff's figure for the purposes of the current motions.

(Defendant's Memorandum In Opposition To Plaintiff's Motion For Summary Judgment at 5.)

"MegaDuster claim". The MegaDuster claim comprises $272,916.56 of the recoupment claim.

The facts relating to the MegaDuster claim are as follows. On November 20, 1997, the Plaintiff issued a purchase order to buy MegaDuster products from Kent. The purchase order contained a clause that the purchaser (PHD) had the right to cancel any part of the order not yet shipped by the seller (Kent). The Plaintiff states that it did not have retail orders lined up for these products, and that the purchase order did not require prior authorization for shipment as usual. On the same day this purchase order issued, the Plaintiff allegedly contacted Kent and issued an amended purchase order containing handwritten instructions that prior authorization must be obtained before the Plaintiff would accept any shipments of MegaDusters.

Despite the amended purchase order, Kent began shipping the MegaDusters, and the first portion of the order was received by the Plaintiff on December 5, 1997. Within the next several days, additional shipments were made, and the Plaintiff even made partial payment in excess of $47,000.00. The Plaintiff alleges that it contacted Kent regarding the erroneous shipments, and indicated that the MegaDusters would be held in Kent's inventory at the Plaintiff's warehouse (as was done with other products pursuant to the Fulfillment Services contracts). The Plaintiff further alleges that because it never assented to the shipments of the MegaDusters, there was no contract for their purchase. It claims that it is entitled to setoff $272,919.56 for refunds and storage costs on the MegaDusters.

The Defendant, however, has submitted declarations providing a different version of these events. Specifically, in those declarations former Kent employees deny ever receiving the amended purchase order. They also claim that phone authorization in fact *was obtained* prior to each shipment of MegaDusters because this was the common course of dealing between the parties. (*See* Salvato and Nagoshiner Declarations attached to Defendant's Memorandum In Opposition.) Accordingly, there was a contract for the purchase of the MegDusters, and the contract is evidenced by the Plaintiff's partial payment of over $47,000.00.

## II. *LAW AND ANALYSIS*

### A. *Summary Judgment Standard*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

The party moving for summary judgment bears the initial burden of production under Rule 56. The burden may be satisfied by presenting affirmative evidence that negates an element of the non-movant's claim or by demonstrating "an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

If the movant meets this burden, the non-movant must "set forth the specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The substantive law identifies which specific facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To avoid summary judgment, the non-movant must "make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the

burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

"The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505 (citing *Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). However, the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[T]he mere existence of some alleged factual disputes between the parties will not defeat an otherwise properly supported motion" for summary judgment. *Anderson,* 477· U.S. at 247–48, 106 S.Ct. 2505.

### B. *The Fulfillment Services*

The Plaintiff claims that it is entitled to reduce the amount of the Defendant's claim based on money owed by Kent for unpaid Fulfillment Services totaling $1,112,569.13. The Defendant does not dispute the amount, but instead alleges that no setoff is permitted for unpaid Fulfillment Services as a matter of law.

Ohio law applies to this case, and Ohio has adopted the Uniform Commercial Code ("U.C.C."). The Defendant relies on the following provision:

> The buyer on notifying the seller of his intention to do so may deduct all or any part of the damages resulting from any breach of the contract from any part of the price still due under the *same contract.*

O.R.C. § 1302.91, codifying U.C.C. § 2–717 relating to sales of goods (emphasis added). The Defendant argues that the "same contract" requirement of this provision precludes setting off money owed for the Fulfillment Services. In short, the Fulfillment Services contracts are separate and distinct from the purchase orders relating to Kent's products, so money owed by Kent for the Fulfillment Services cannot be setoff against the accounts receivables stemming from the purchase orders. The Defendant further argues that when the Plaintiff refused to pay Kent in May 1998, it unilaterally exacted itself a priority over other creditors, including the Defendant as a secured creditor, to which the Plaintiff was not entitled.

On the other hand, the Plaintiff relies on the following provision:

> (A) Unless an account debtor has made an enforceable agreement not to assert defenses or claims arising out of a sale as provided in section 1309.17 of the Revised Code, *the rights of an assignee are subject to:*
>
> (1) all the terms of the contract between the account debtor and assignor and any defense or claim arising therefrom; and
>
> (2) *any other defense or claim of the account debtor against the assignor which accrues before the account debtor receives notification of the assignment.*

O.R.C. § 1309.37, codifying U.C.C. § 9–318(1)(a) and (b) relating to secured transactions (emphasis added). As a secured creditor, the Defendant is an "assignee" for purposes of this provision. *First National Bank of Boston v. Thomson Consumer Electronics, Inc.,* 84 F.3d 397, 400 (11th Cir.1996); *In re Davidson Lumber Sales, Inc.,* 66 F.3d 1560, 1565 (10th Cir. 1995); *Bank of Waunakee v. Rochester Cheese Sales, Inc.,* 906 F.2d 1185, 1189 (7th Cir.1990). Subsection (A)(2) applies here. The Plaintiff argues that regardless of the separateness of the contracts, it certainly has "claims" against Kent for the unpaid Fulfillment Services. Under the plain language of section 1309.37(A)(2),

therefore, the Defendant, Kent's assignee, is subject to such claims.

■ The relationship between U.C.C. §§ 2–717 and 9–318 is a matter of first impression. The parties cite numerous cases allegedly supporting their respective positions, but, as further analyzed below, the vast majority of those cases do not involve the precise situation presented here. In addition, the cases most on point arise from other jurisdictions.

The Defendant relies on cases applying the "same contract" rule. In such, buyers of goods have been precluded from unilaterally offsetting debts to the seller because of the seller's debt to the buyer on a separate contract, such as distribution agreement. (*See, e.g.,* cases cited in Defendant's Memorandum In Opposition To Plaintiff's Motion For Partial Summary Judgment at 10–12; Defendant's Memorandum In Support of its Motion For Summary Judgment at 6–10, and Reply Brief In Support at 3–4.) These cases, however, generally do not address a buyer's rights against an *assignee of the seller,* particularly a secured creditor with rights to the accounts receivable on the goods. Accordingly, these cases do not address whether U.C.C. § 9–318 grants additional remedies for buyers applicable to assignees. The cases relied upon by the Defendant, therefore, do not substantially aid in this Court's analysis.

The Plaintiff relies heavily on the following cases: *First National Bank of Boston v. Thomson Consumer Electronics, Inc.,* 84 F.3d 397 (11th Cir.1996) and *In re Otha C. Jean & Associates, Inc.,* 152 B.R. 219 (Bankr.E.D.Tenn.1993). In each, a bank had a security interest in the accounts receivable of a party in bankruptcy. The banks sought payment from the account debtors who owed on the accounts receivable. The account debtors successfully argued that the banks' claims should be reduced by claims against the bankrupt party pursuant to U.C.C. § 9–318. In each of these cases, however, *the accounts receivables were not based on sales of goods.*[2] Thus, U.C.C. § 2–717 could not possibly apply to limit setoff rights under § 9–318, as the Defendant argues here. These cases, therefore, do not present the same set of circumstances and do not aid in this Court's analysis.

The Plaintiff also relies on *In re Davidson Lumber Sales, Inc.,* 66 F.3d 1560, 1565 (10th Cir.1995) and *Bank of Waunakee v. Rochester Cheese Sales, Inc.,* 906 F.2d 1185 (7th Cir.1990). In these cases, in contrast to *First National Bank* and *Otha Jean,* the accounts receivable stem from purchases of goods. In addition, the courts held that the account debtors could assert setoffs under U.C.C. § 9–318(1)(b). *Davidson,* 66 F.3d at 1565; *Waunakee,* 906 F.2d at 1191. However, for reasons not ascertainable from the opinions, the potential application of U.C.C. § 2–717 was neither raised by the parties nor addressed by the courts. Accordingly, these cases do not analyze the precise issue raised by the Defendant here, and, therefore, likewise do not aid in this Court's analysis.

The only case identified that addresses the precise issue presented here is *Barclaysamerican/Business Credit, Inc. v. Paul Safran Metal Co.,* 566 F.Supp. 254 (N.D.Ill.1983). There, the defendant buyer purchased metal products from a non-party seller and owed approximately $44,000.00, which the non-party seller maintained on its books as accounts receiv-

**2.** In *First National Bank,* the accounts receivable stemmed from a shipping services contract. In *Otha Jean,* they were based on work the bankrupt party had performed as a subcontractor.

able. The plaintiff had loaned money to the non-party seller, and took a security interest in the accounts receivable as collateral for the loan. When the non-party seller defaulted on the loan, the plaintiff demanded payment from the defendant pursuant to the interest in the accounts receivable. The defendant refused to pay on the ground that the non-party seller owed it money in excess of the $44,000.00 based on other contracts. The plaintiff then brought suit.

■ As stated above, one who takes a security interest in accounts receivable is an "assignee" under U.C.C. § 9–318(1)(b). The defendant argued that the claim of the plaintiff, an assignee of the non-party seller, was subject to the non-party seller's debt to the defendant pursuant to U.C.C. § 9–318(1)(b). The plaintiff countered that U.C.C. § 2–717 precluded any setoff under the "same contract" requirement. The same arguments are made in the case before this Court. In *Barclays*, the court ruled in favor of the defendant buyer (analogous to PHD's position here):

> By its language, § 2–717 simply sets forth one right of a buyer of goods against a seller. It is not an exclusive pronouncement of a buyer's rights, nor does it address the rights of a buyer as against a seller's assignee. Section 2–717 cannot be said to supercede or limit § 9–318, which does specifically address the rights of a debtor against an assignee.

*Id.* at 256. In addition, the court held that the phrase "any other ... claim", as used in section 9–318(1)(b), includes claims that could be presented as counterclaims in an action by the seller, even if such claims arise under separate contracts. *Id.* at 257. The court concluded, therefore, that the defendant could setoff claims asserted by the non-party seller's assignee to the ex-

tent the defendant had claims against the non-party seller under separate contracts.

This Court agrees with the analysis in *Barclays*. The contracts for the Fulfillment Services do not involve the sale of goods, and thus are not governed by Article 2 of the U.C.C. Rather, the various obligations under the Fulfillment Services contracts are governed by common law contract principles. Certainly, the Plaintiff has claims for breach of contract against Kent insofar as Kent has not paid for services provided. Indeed, the Plaintiff asserted such claims against Kent during the adversary proceeding in bankruptcy. Under O.R.C. § 1309.37(A)(2) (corresponding to U.C.C. § 9–318(1)(b)), the Defendant, as Kent's assignee, obtained its assignment subject to "*any other defense or claim*" assertable against Kent. The Plaintiff's common law claims for breach of the contracts for the Fulfillment Services is within the quoted phrase.

The Court finds support for this conclusion in *ECHO, Inc. v. Whitson Company, Inc.*, 52 F.3d 702 (7th Cir.1995). There, the plaintiff seller brought suit to collect money owed on purchases of goods, and the defendant buyer asserted counterclaims for breach of a separate distributorship agreement. The court held that the defendant did not have a setoff defense *specifically under U.C.C. § 2–717.* This conclusion, however, did not completely resolve the matter because resolution of the counterclaim was required for a final determination of the amount of money owed between the parties:

> Regardless of our ruling on the issue before us here, however, PTC [buyer] must wait until the trial on its counterclaim before knowing whether it can satisfy its debt to ECHO with less than the purchase price of the goods it received.... [I]f PTC wins on its counter-

claim, the two judgments will become executory simultaneously. *The real point is that only the resolution of the counterclaim will ultimately determine how much money each party owes the other.* This case merely represents a dispute over how to begin the accounting process.

*Id.* at 704, emphasis added. An assignee of the seller was not involved in *ECHO,* so section 9–318(1)(b) did not apply. The case, however, stands for the general proposition that a buyer can assert valid claims against a seller independent of section 2–717. Therefore, it follows from the language of section 9–318(1)(b) that an assignee would be subject to such claims. *See also Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.,* 7 F.Supp.2d 954, 961 (N.D.Ohio 1998) (final judgment not entered in favor of seller when buyer's outstanding counterclaims could result in a setoff).

The Defendant also relies on O.R.C. § 1309.04, codifying U.C.C. § 9–104, which states: "Sections 1309.01 to 1309.50 of the Revised Code do not apply ... (H) To any right of set-off." It argues that this provision bars application of U.C.C. § 9–318 to the Plaintiff's claims. This argument lacks merit. Courts have interpreted U.C.C. § 9–104 to mean only that a party merely claiming a setoff interest does not have to meet the U.C.C. filing requirements necessary to perfect security interests. It does not limit a buyer's remedies against a seller's assignee under section 9–318. *Davidson,* 66 F.3d at 1565; *Otha Jean,* 152 B.R. at 222.

For the foregoing reasons, the Court concludes that O.R.C. § 1302 .91 (U.C.C.

§ 2–717) does not preclude setoffs against assignees under separate contracts pursuant to O.R.C. § 1309.37(A)(2) (U.C.C. § 9–318(1)(b)). Such setoffs, however, are limited in time, applying only to the extent the claim "accrues before the account debtor receives notification of the assignment." O.R.C. § 1309.37(A)(2). The parties dispute the date upon which the Plaintiff received notice of the Defendant's interest.

The Plaintiff's claim for Fulfillment Services can be divided into three time periods: (1) amounts for services rendered before Kent filed its bankruptcy petition on May 21, 1998, totaling $828,239.21; (2) amounts for services rendered after Kent. filed its petition, but before the Defendant substituted itself for Kent on February 24, 1999, totaling $95,913.92;[3] and (3) amounts for services rendered after the Defendant's substitution, totaling $188,416.00 (as of the date of the briefing on the current motions). The Defendant argues that any setoff for unpaid Fulfillment Services must be capped at $828,239.21 because the Plaintiff received notice of the Defendant's interest when it received Kent's bankruptcy petition. It cannot be disputed that the petition identifies the Defendant's security interest and contains a copy of the security agreement. The Plaintiff, however, argues that Kent's petition does not meet the standards for notice required under O.R.C. § 1309.37(A)(2). Rather, the appropriate notice date is February 24, 1999, when the Defendant substituted itself for Kent during the bankruptcy proceedings.

 Resolution of this dispute requires analysis of two subsections of

---

**3.** The Defendant states that the Plaintiff was actually served with the bankruptcy petition on May 28, 1998, several days after it was filed. In arguing the amount of the setoff, however, the parties refer only to the filing date. For the purposes of the current motions, the Court relies on the amounts provided by the parties, and assumes that any adjustment for the short delay in service would be negligible.

O.R.C. § 1309.37. As stated above, subsection (A)(2) limits setoff rights to amounts accruing "before the account debtor receives notification of the assignment". The Plaintiff additionally relies on subsection (C), which states in relevant part:

> The account debtor is authorized to pay the assignor until the account debtor receives notification that the amount due or to become due has been assigned and that payment is to be made to the assignee. A notification which does not reasonably identify the rights assigned is ineffective.

Thus, notice under subsection (C) requires: (1) an indication that the account has been assigned; (2) *a specific direction that payment be made to the assignee rather than the assignor;* and (3) a reasonable identification of the rights assigned. *Surety Savings & Loan Co. v. Kanzig,* 53 Ohio St.2d 108, 112, 372 N.E.2d 602 (1978) (emphasis added). The Plaintiff argues that subsection (C) should be used to determine the sufficiency of the notification under subsection (A)(2). If so, then Kent's bankruptcy petition is not adequate notification because it does not contain a direction to pay the assignee (the Defendant), the second *Kanzig* requirement. The Defendant argues that subsection (C) standards should not be applied, so a direction that payment be made to the assignee is not required.

The Court agrees with the Defendant. Under the plain language of subsection (A)(2), limiting setoff rights requires only "notification of the assignment". In contrast, to require a buyer to pay an assignee rather than the assignor, there must be "notification [of the assignment] *and* that payment be directly made to the assignee" (emphasis added). Thus, the requirement of the payment direction, the second *Kanzig* prong, is explicit in subsection (C), but absent in subsection (A)(2). The only rea-

sonable interpretation is that the second *Kanzig* prong is not a requirement for notice in the context of limiting setoff rights. Indeed, *Kanzig* itself states that the requirements set forth therein are "to obligate the account debtor to make payment to the assignee, rather than the assignor". 53 Ohio St.2d at 112, 372 N.E.2d 602. The case does not bear on setoff rights under subsection (A)(2).

Cases from other jurisdictions support this interpretation. In *In re Apex Oil Co.,* 975 F.2d 1365 (8th Cir.1992), the court analyzed identical provisions in the Texas U.C.C. The court stated that subsection (C) is intended to protect buyers who mistakenly pay debts to the assignor after the assignment. If such buyer has not received the requisite notice, then the assignee cannot collect payment from the buyer, thus protecting the buyer from a double payment. If, however, the buyer has not paid the assignor, but instead asserts setoff rights (like here), then subsection (C) does not apply and the situation is analyzed only under subsection (A). *Id.* at 1368. Based on this reasoning, courts have held that the notification of assignment necessary to limit setoff rights under subsection (A)(2) *does not* require a direction to make payment to the assignee. *See 4447 Associates v. First Security Financial,* 889 P.2d 467, 472 (Utah App.), *cert. denied,* 899 P.2d 1231 (1995); *In re Bancroft Dairy, Inc.,* 10 B.R. 920, 927 (Bankr.W.D.Mich.1981). The Court concludes, therefore, that to limit the Plaintiff's setoff rights, the notification of assignment need not have contained a direction to pay the Defendant directly.

Kent's bankruptcy petition was served on the Plaintiff. The petition identified the Defendant's security interest in Kent's accounts receivable, and contained a copy of the security agreement. The Plaintiff,

therefore, was fully informed of the existence and nature of the Defendant's rights. Accordingly, as a matter of law, the petition provided the Plaintiff with "notification of the assignment" under O.R.C. § 1309.37(A)(2), thereby limiting the Plaintiff's setoff claim to pre-petition amounts.

■ Finally, the Plaintiff argues that despite any limitations imposed by the U.C.C., it is entitled to setoff post-petition amounts based on other principles of law. It alleges that both Kent and the Defendant have refused to allow the Plaintiff to dispose of Kent's products still remaining in inventory. Because the Plaintiff lacks permission to dispose of such products, the Defendant should bear the cost of maintaining them in inventory.

The Court disagrees. The Plaintiff does not cite any authority for the proposition that the U.C.C. provisions are not dispositive. In addition, in its own memorandum the Plaintiff states that it continued to provide the Fulfillment Services on the expectation of a continued business relationship with Kent after the bankruptcy proceedings were completed. (Plaintiff's Memorandum of Law at 7.) Subsequently, however, Kent amended its petition to undergo liquidation instead of reorganization. By performing services for an entity in bankruptcy, the Plaintiff took the risk that it would not be paid. It cannot pass that risk onto the Defendant now that Kent has ceased operations.

In conclusion, from the amount owed by the Plaintiff under Kent's accounts receivable, it can setoff amounts for unpaid Ful-

fillment Services performed before Kent filed its bankruptcy petition. It cannot setoff amounts for unpaid post-petition Fulfillment Services.[4]

## C. The MegaDuster Claim

■ The Plaintiff also claims that it is entitled to setoff $272,916.56 arising out of shipments of Kent's MegaDuster product. The parties dispute whether there was ever a contract for the purchase of the MegaDusters.

The Plaintiff alleges that on November 20, 1997, it issued an erroneous purchase order for the MegaDusters. That same day, it contacted Kent regarding the errors and issued an amended purchase order explicitly requiring Kent to obtain authorization before shipping any Mega-Dusters. Kent shipped the products in early December. In declarations of former Kent employees, they deny ever receiving the amended purchase order. In addition, they state that, pursuant to prior practices between the parties, Kent in fact obtained authorization before shipping. The Defendant further alleges that the existence of a contract is evidenced by the Plaintiff's partial payment of over $47,000.00 for the MegaDusters. Alternatively, the Defendant argues that the partial payment constitutes a waiver or estoppel from now denying the existence of a contract.

■ Whether or not a contract exists is a question of fact. *Oglebay Norton Co. v. Armco, Inc.,* 52 Ohio St.3d 232, 235, 556 N.E.2d 515 (1990); *Gruenspan v. Seitz,* 124 Ohio App.3d 197, 705 N.E.2d 1255,

---

4. The Defendant argues that the bankruptcy code, particularly 11 U.S.C. § 553, further limits the Plaintiff's setoff rights. The Plaintiff argues that the bankruptcy code is inapplicable. On this issue, the Court agrees with the Plaintiff. In the abstention order, the bankruptcy court concluded that the Defendant was a "severely undersecured creditor".

The issues raised here, therefore, could not affect the bankruptcy estate. Indeed, the bankruptcy court concluded that as between PHD and Coast, "all issues concern state law and not federal or bankruptcy law", and constitute a "case among third parties not arising under Title 11." The bankruptcy code, therefore, does not apply.

1264 (1997); *Garrison v. Daytonian Hotel,* 105 Ohio App.3d 322, 663 N.E.2d 1316, 1317 (1995). Here, the parties present different versions of the events pertaining to the alleged amended purchase order for the MegaDusters. The different versions present issues of fact for a jury, including on the matters of waiver and estoppel. Accordingly, summary judgment is denied as to both parties on the Plaintiff's Mega-Duster claim.[5]

### III. CONCLUSION

For the foregoing reasons, Defendant Coast Business Credit's Motion For Summary Judgment (Docket No. 25) and Plaintiff PHD, Inc.'s Motion For Partial Summary Judgment (Docket No. 27) are both GRANTED IN PART AND DENIED IN PART. The Court hereby orders as follows:

(1) From the amount owed by the Plaintiff under Kent's accounts receivable, it can setoff amounts for unpaid Fulfillment Services performed before Kent filed its bankruptcy petition, which, as stated by the parties, totals $828,239.21.

(2) The Plaintiff cannot setoff amounts for unpaid post-petition Fulfillment Services.

(3) Genuine issues of material fact exist regarding the Plaintiff's MegaDuster claim, so summary judgment is denied on this claim as to both parties.

IT IS SO ORDERED.

---

5. Under certain circumstances, the U.C.C. controls the existence and terms of a contract as a matter of law. For example, the U.C.C. provides rules for determining the terms of a contract when parties exchange business forms not having identical terms. *See Mead Corp. v. McNally–Pittsburg Manufacturing Corp.,* 654 F.2d 1197, 1206 (6th Cir.1981).

Here, however, the dispute centers around whether the amended purchase order was ever received, and whether, in any event, Kent obtained the authorization to ship the MegaDusters as allegedly required. These disputes present factual issues even under U.C.C.